## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CIVIL ACTION NO.: _____ _____ |
| Plaintiff, | : | UNITED STATES' COMPLAINT FOR |
| v. | : | VIOLATIONS OF: |
| | : | |
| JOHN B. TORKELSEN, RICHARD D. | : | (1)  FALSE CLAIMS ACT(31 U.S.C. § |
| PROPPER, M.D., DANIEL P. | : | 3729(A)(1)); |
| BEHARRY, AND SOVEREIGN BANK | : | (2)  FALSE CLAIMS ACT (31 U.S.C. § |
| f/k/a MAIN STREET BANK, | : | 3729(A)(2)); |
| | : | (3)  FALSE CLAIMS ACT (31 U.S.C. § |
| Defendants. | : | 3729(A)(3)); |
| | : | (4)  UNJUST ENRICHMENT; AND |
| | : | (5)  PAYMENT BY MISTAKE |
| | : | |

1.     The United States of America, by and through the Department of Justice and on

behalf of its agency, the United States Small Business Administration (SBA), brings this civil

action under the False Claims Act (FCA), 28 U.S.C. § 3729 *et seq.*, and the common law for the

recovery of damages for fraud perpetrated on the SBA through its Small Business Investment

Company (SBIC) program. The Defendants, in various capacities, submitted or caused to be

submitted false claims and/or false statements in order to receive federal funds from the SBA.

As a result of the Defendants' false claims and false statements, the United States paid $32

million to Acorn Technology Fund, L.P. (Acorn), an SBIC used by these Defendants to defraud

the SBA.

2.     This case involves false claims submitted in connection with a Small Business

Investment Company (SBIC) known as Acorn Technology Fund, LP.  This Complaint also

involves a number of acts, transactions and agreements that violated SBA regulations, including

an agreement among Defendants Propper, Beharry and Torkelsen that violated 13 C.F.R. §§ 107.410, 510, 520, 585, 730 and 885, an illegal loan by Defendant Propper to Acorn that violated 13 C.F.R. § 107.570, as well as false submissions to SBA by them to conceal the agreement in violation of 13 C.F.R. §107.507(b); false submissions in a license application and supporting materials submitted to SBA by and among Defendants Torkelsen, Propper, and Beharry concerning the management, investments and other transactions of Acorn in violation of 13 C.F.R. § 107.507(b); violations of SBA's conflict of interest and overline regulations under 13 C.F.R. §§ 107.730 and 740 by Defendants Propper, Beharry and Torkelsen; excessive management expenses for Defendants Propper, Beharry and Torkelsen in violation of 13 C.F.R. § 107.520; other activities done or caused by the Defendants that are not contemplated by the Small Business Investment Act of 1958, as amended, in violation of 13 C.F.R. § 107.500; false statements submitted or caused to be submitted to SBA by Defendant Sovereign Bank that concealed or assisted Defendant Torkelsen in concealing the true status of assets of Acorn; and false statements submitted or caused to be submitted to SBA by each of the Defendants in violation of 13 C.F.R. § 107.507(b) to conceal the illegal nature of their transactions, conduct, agreements and arrangements so that SBA would continue to provide millions of dollars of federal funds to Acorn.

3.      Each of the Defendants violated the False Claims Act with respect to false claims and false statements submitted to SBA that concealed violations of SBA's regulations.

## PARTIES

4.      The United States of America brings this action on its own behalf and on behalf of its agency, the SBA, which administers the SBIC program.

- 2 -

5.      Defendant John Torkelsen is an individual who is currently in federal custody as a result of his guilty plea for making false statements in the records of an SBIC and submitting them to SBA.  United States v. Torkelsen (D.D.C. Case No. Crim. 05-0336 RBW).  He is an involuntary resident of the state of West Virginia and his last known address is the Federal Detention Center, Morgantown, West Virginia.  Torkelsen was the managing member of Acorn Technology Partners, LLC, Acorn's general partner of record.  Together with Defendants Propper and Beharry, Torkelsen managed and controlled Acorn.

6.      Defendant Richard D. Propper, M.D., is a resident of the State of California and his last known business address is 4350 LaJolla Village Drive, Suite 970, La Jolla, California 92122 and his last known residential address is 2890 Moon Ridge Drive, LaJolla, California 92037.  Propper directed and controlled significant portions of Acorn's investments, made an illegal loan to Acorn, made false representations directly to SBA about his unfunded commitment, received excessive management fees or other illegal payments from Acorn and engaged in conflict of interest transactions with Acorn.

7.      Defendant Daniel P. Beharry, Esq., is an attorney and resident of the State of Connecticut and his last known address is 2044 Main Street, Glastonbury, Connecticut.  Beharry directed and controlled portions of Acorn's investments, made false representations directly to SBA about an unfunded commitment, received excessive management fees or other illegal payments from Acorn and engaged in conflict of interest transactions with Acorn.

8.      Defendant Sovereign Bank N.A. (Sovereign Bank) is the successor in interest to Main Street Bank, a corporation incorporated under the laws of the State of Delaware.  Sovereign Bank's last known address is 1500 Market Street, Philadelphia, PA.

- 3 -

## JURISDICTION AND VENUE

9.     This action is brought by the United States for violation under the False Claims

Act (FCA), 31 U.S.C. § 3729, *et seq*.  This Court has subject matter jurisdiction over this action

pursuant to 28 U.S.C. § 1345 (claims brought by the United States) and 31 U.S.C. § 3732 (FCA

jurisdiction).

10.     This Court has personal jurisdiction over the Defendants because the acts at issue

in this case took place in this District.  28 U.S.C. § 1331.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 31 U.S.C. §

3729.  Acorn's principal office was located in this District and significant acts of the conspiracy

took place in this District.

## THE FALSE CLAIMS ACT

12.     The FCA provides, in pertinent part, that:

(a) Any person who (1) knowingly presents, or causes to be presented, to an
officer or employee of the United States Government or a member of the Armed
Forces of the United States a false or fraudulent claim for payment or approval;
(2) knowingly makes, uses, or causes to be made or used, a false record or
statement to get a false or fraudulent claim paid or approved by the Government;
(3) conspires to defraud the Government by getting a false or fraudulent claim
paid or approved by the Government;. . . or (7) knowingly makes, uses, or causes
to be made or used, a false record or statement to conceal, avoid, or decrease an
obligation to pay or transmit money or Property to the Government,

* * *

is liable to the United States Government for a civil penalty of not less than
$5,000 and not more than $10,000, plus 3 times the amount of damages which the
Government sustains because of the act of that person . . . .

(b) For purposes of this section, the terms  "knowing" and "knowingly" mean that
a person, with respect to information (1) has actual knowledge of the information;
(2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts
in reckless disregard of the truth or falsity of the information, and no proof of

- 4 -

specific intent to defraud is required.

31 U.S.C. § 3729.

## THE SMALL BUSINESS INVESTMENT COMPANY PROGRAM

13.    The SBA administers a program pursuant to the Small Business Investment Act of

1958, as amended, 15 U.S.C. §§ 661 *et seq*. (the Act), known as the Small Business Investment

Company Program.  That long-standing program is designed to stimulate the American economy

by promoting small businesses that need, but otherwise might not get, financing.  To accomplish

these goals, private investors locate promising small businesses that they believe are worth

funding.

14.    Under the Small Business Investment Company Program, the SBA licenses firms,

known as Small Business Investment Companies (SBICs), to provide venture capital to qualified

small businesses.  Once licensed by the SBA, an SBIC can receive up to two dollars in federal

matching funds for each private dollar it has available for investment purposes.

15.    The Act authorizes SBA to promulgate regulations governing the SBIC Program.

15 U.S.C. § 687(c).  Those regulations are codified at 13 C.F.R. §§ 107.20 to 107.1930.  The Act

also requires SBA to promulgate regulations specifically governing conflicts of interest.  15

U.S.C. § 687d.  SBA's conflict of interest regulations flatly prohibit self-dealing by SBICs and

their management.  13 C.F.R.  § 107.730(a).  The purpose of these rules is to ensure arm's-length

investments by SBICs and prevent an SBIC's managers from misapplying government funds to

serve their own pre-existing interests.

## SBIC PROGRAM REGULATIONS

16.    SBICs may only undertake activities in accordance with the mandates of the

Program.  13 C.F.R. § 107.500.  Thus, an SBIC may not make any investments or take any other actions that are not permitted by the Act or the SBA's regulations.  SBICs are required to make their books and records available for SBA's review.

17.      Any investments made by a prospective SBIC before its license is approved, either before the application is submitted or while the application is pending, are called "pre-license investments."  All pre-license investments must be in compliance with the Act and regulations.

18.      Any pre-license investments that an SBIC applicant may have made before submitting its application must be disclosed to the SBA as part of the license application so that they can be reviewed by the SBA.  See 13 C.F.R. § 107.300.  Likewise, while an SBIC's license application is pending, the applicant must submit for the SBA's review and prior written approval any investments that it wishes to make.

19.      One reason that all pre-application investments have to be disclosed to the SBA for review as part of the application and that all other pre-license investments must have prior written approval of the SBA is so that an applicant's pre-license investments can be screened for prohibited conflicts of interest or self-dealing.  For this reason, one part of the pre-license investment approval process is the submission of a questionnaire by the applicant that addresses whether the target of the proposed investment is an Associate of the SBIC or its managers.  An Associate is a person or entity that meets the definition under 13 C.F.R. § 107.50.  There are a number of facts and relationships that can make a person or entity an Associate, mostly based upon aspects of Control, which means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Licensee or other concern, whether through the ownership of voting securities, by contract, or otherwise.  13  C.F.R. § 107.50.  The

- 6 -

term Associate is used to identify those persons and entities whose dealings with an SBIC will trigger the application of a number of regulations, including SBA's conflict of interest prohibitions of 13 C.F.R. § 107.730.

20.     To carry out the self-dealing prohibition, and to prevent theft or misapplication of public funds, there are a number of specific conflict-of-interest of interest prohibitions in the SBA's regulations.  Under these rules, SBICs are prohibited from financing businesses in which the SBIC's owners or managers have pre-existing ownership or management interests. Specifically, SBICs may not finance any entity where the owners, officers, directors or employees of that SBIC (or their close relatives) own more than 5% of that entity's stock.  See 13 C.F.R. §§ 107.730(d)(1), 107.730(a)(1), 107.50(8).  Investments in such entities could allow the individuals managing SBICs to protect or enrich their own pre-existing interests at the public's expense.  SBA's regulations also restrict the ability of officers, directors or employees of SBICs to serve as officers, directors or 5% owners of businesses in which the SBIC wishes to invest prior to investment by the SBIC.  13 C.F.R. §§ 107.730(e), 107.50(8)(i).

21.     SBA requires that SBICs disclose who their managers are to satisfy SBA that they have qualified management.  13 C.F.R. §107.130.  In addition, disclosure of management is necessary to assist SBA in assessing whether conflicts of interest exist under 13 C.F.R. §107.730. SBA also requires disclosures and prior approval of changes in Control of management.  13 C.F.R. §107.400 et seq.

22.     Although a licensed SBIC does not need prior governmental approval to make an investment in a qualified small business, the SBIC is required to follow the SBA's regulations that prohibit self-dealing and conflict-of-interest financing.  The SBIC is subject to examination

- 7 -

by the SBA no less often than once every two years.  Among other things, the SBA's examination

reviews a sample of the SBIC's investments for compliance with the SBA's conflict-of-interest

regulations.

23.     Banks which transact business with SBICs may be required to verify the SBIC's

account balances using standard government forms.  These verifications allow the SBA to

confirm that (1) the amount of leverage dollars being released is correct and (2) the SBIC is

financially sound.  As such, these verifications are used to ensure the integrity of the SBIC

program.

## THE SBIC FUNDING PROCESS

24.     Once licensed, an SBIC may seek a "Leverage Commitment" of federal money

from the SBA.  See 13 C.F.R. §107.1100 et seq.  An SBIC may obtain a federal Leverage

Commitment of up to twice its paid-in private capital.  Once a commitment has been obtained,

the SBIC draws its Leverage Commitment down by obtaining a series of "draws."  See 13 C.F.R.

§ 107.1200 et seq.  Each draw requires the SBIC first to submit a certification to the SBA

representing, among other things, that it is in compliance with all SBA regulations.    13 C.F.R. §

107.1230(d)(3).  Once the SBA certifies an SBIC's draw request, the SBIC submits a second

certification of regulatory compliance to a bank designated by the SBA which then supplies the

SBIC with federal funds.

## THE CREATION AND LICENSING OF ACORN

25.     Acorn Technology Fund, LP (Acorn) is a New Jersey Limited Partnership whose

general partner is Acorn Technology Partners LLC (ATP), a New Jersey limited liability

corporation.  Acorn was formed solely to operate as an SBIC under the SBA's regulations.  Since

- 8 -

January 2003, Acorn has been the subject of a receivership action in this district.  United States v. Acorn Technology Fund, L.P., C.A. No. 03-0070.

26.      On or about June 25, 1998, Acorn submitted an application to the SBA to become a licensed SBIC under 13 C.F.R. §107.300.  It completed the application in 1999 with exhibits required by SBA.  That application was signed by Defendant Torkelsen.  At the time Acorn submitted its SBIC application to the SBA, Defendant Torkelsen owned 67 percent of ATP, with Richard Roberts and R. Wood Tate owning the rest.

27.      As part of the application process, the SBA requires that the management team of prospective SBICs attend training that includes extensive coverage of SBA's conflict-of-interest regulations as they apply to SBICs.  The course also covers the necessity of obtaining prior approval from the SBA for any pre-license investments.  On September 2, 1998, Defendant Torkelsen attended the SBA's required training for prospective members of an SBIC's management.

28.      The application identified PVR Management, Inc. as the Investment Adviser/Manager.  PVR Management was owned by John Torkelsen.  The application also states that PVR Securities, Inc. would provide services to Acorn, as well, and essentially operate as one entity with PVR Management.  PVR Securities was owned by John Torkelsen.  As part of the license application, a management contract for PVR Management was submitted to SBA for approval under 13 C.F.R. §107.510.  Defendant Torkelsen, with the agreement of Propper and Beharry, represented to SBA that the PVR companies were the only entities providing management services to Acorn; as will be explained later, this was not true.

29.      On June 25, 1999 Acorn was licensed by the SBA as an SBIC that would

- 9 -

exclusively do business under the regulations pertaining to SBICs.

## PROPPER AND BEHARRY'S SECRET AGREEMENTS TO CONTROL ACORN FUNDS

30.    In its written application for an SBA license, Acorn identified to SBA who would be managing Acorn, who would be making investment decisions for Acorn and who would be Acorn's Investment Adviser/Manager. This information was material to SBA's decision to grant Acorn SBIC status.

31.    The application identified Acorn Technology Partners, LLC (ATP) as the general partner, with its members identified as John Torkelsen, Wood Tate and Richard Roberts. Each of them submitted forms for SBA background checks. In fact, these individuals managed only a portion of Acorn's funds. Two other individuals, Defendants Propper and Beharry, had entered into a side agreement with Defendant Torkelsen, to control a significant portion of the fund's money. These agreements were hidden from SBA. Had SBA known of these agreements, it would not have granted Acorn SBIC status. The reason that Defendant Torkelsen struck these side deals was to ensure that Acorn would meet SBA's capital requirements for SBIC status.

32.    In its written application for an SBA license, Acorn stated that it intended to obtain leverage from SBA by issuing Participating Securities to SBA in the form of a preferred limited partnership interest under 15 U.S.C. § 681(g) and 13 C.F.R. §§ 107. 1500, *et seq*. Participating Securities are the mechanism through which SBA provided federal funds to Acorn. In order to qualify for an SBIC license as Participating Securities issuer, Acorn needed a minimum of $10 million of Regulatory Capital under 13 C.F.R. §107.210. Regulatory Capital is capital contributed by private investors, under certain limitations under 13 C.F.R. § 107.50. As

of November 1998, Acorn did not have $10 million in Regulatory Capital.

33.     Defendants Propper and Beharry caused, arranged for, or otherwise participated in the arrangement of capital contributions to Acorn that allowed Acorn to meet the $10 million minimum of Regulatory Capital through capital contributions by Acorn Connecticut Investments, L.P. (ACI), themselves individually, and friends, business associates or other persons known to Propper and/or Beharry (collectively, the Propper-Beharry Investments).

34.     In exchange for the Propper-Beharry Investments, Defendant Torkelsen agreed to cede control of management and investment decisions over a certain portion of Acorn's funds, including SBA leverage funds, to Defendants Propper and Beharry without SBA approval.  This arrangement was illegal under SBA regulations. 13 C.F.R. §§ 107.410, 510, 520, 585, 730 and 885.

35.     Nevertheless, Defendants Propper, Beharry, and Torkelsen agreed to go forward with the Propper-Beharry Investments.  Defendant Propper placed conditions on the Propper-Beharry Investments in an agreement with John Torkelsen and/or entities managed and controlled by him.

36.     The Propper-Beharry Investments were conditioned on: the direction by Acorn of a like amount of funds to investments in entities chosen by Propper and/or Beharry (the Investment Quid Pro Quo); a payment of 50% (later reduced to 40%) of the management fees otherwise payable by Acorn to its general partner ATP (the Propper Fee Kickback); and a right to payment of 50% of the carried interest (the profit of the SBIC) of the general partner ATP (the Propper Profit Kickback).  Propper, Beharry and Torkelsen agreed that Acorn would have to return the Propper-Beharry Investments  in the event the illegal investments and kickbacks were

- 11 -

not made. Collectively, this entire agreement violated 13 C.F.R. §§ 107.410, 500, 510, 520, 585, 730 and 885. The agreement was hidden from SBA, in violation of 13 C.F.R. § 507(b). The agreement also rendered false the representations by Propper and Beharry made directly to SBA in Acorn's Limited Partnership Agreement that the unfunded portion of their commitments qualified as binding commitments under SBA regulations, thereby further violating 13 C.F.R. § 507(b). In addition, Defendants Propper and Torkelsen engaged in an illegal loan to Acorn of $1 million in 1999 that violated 13 C.F.R. §§ 107.570 and 703(a)(3)(ii) because Propper is not a regulated financial institution, SBA did not approve the loan and Propper was a director of small businesses financed by Acorn. Certifications of compliance with SBA regulations, which are prerequisites for draw-downs of SBA funds, were false because the quid pro quos, kickbacks, false statements and the loan rendered Acorn noncompliant.

37.     These agreements gave Propper the power to direct or cause the direction of the management and policies of Acorn by contract or otherwise. Defendant Propper therefore had Control of Acorn's investments and policies, and therefore was an Associate of Acorn, as those terms are defined in the Regulations. 13 C.F.R. §107.50.

38.     At all relevant times, the portion of the Propper-Beharry Investments made directly by ACI constituted at least 10% of the partnership capital of Acorn. Therefore, by definition, ACI was an Associate of Acorn because of its 10% interest in Acorn. As general partner of ACI, Defendant Beharry was also an Associate of Acorn and a Control Person, because general partners of 10% interest-holders are defined as Associates under the Regulations, 13 C.F.R. §107.50.

39.     Nowhere on the license application or in the management contract was Defendant

- 12 -

Propper identified as having a role in directing, or having the power to direct, investment decisions or policies of Acorn; in being eligible to receive any portion of the management fees of Acorn; in having a right to any portion of the general partner's carried interest of other profits; or in otherwise possessing control with respect to Acorn, ATP or John Torkelsen, as those terms are defined in 13 C.F.R. §107.50. Furthermore, Acorn made no submission to SBA for prior approval of Propper to possess control over Acorn under 13 C.F.R. §107.410 or any other regulation during the licensing process or at any time later. The lack of these disclosures, and the failure to seek approval, rendered the certifications associated with payment draws false.

40.     In fact, had Defendant Propper's role been disclosed to SBA, SBA would not have granted Acorn SBIC status. In 1996, Defendant Propper had been the subject of a SEC consent order for failing to comply with filing requirements in connection with certain companies with which he had relationships. Upon information and belief, Torkelsen and Beharry were aware of Propper's SEC consent order and Defendants Torkelsen, Propper and Beharry decided not to disclose Propper's involvement with Acorn to the SBA due to that consent order. The SBA would not have allowed Defendant Propper to be a manager of Acorn because of this SEC Consent Order.

41.     The submissions made by Acorn to SBA during the pre-licensing process were materially false because they failed to disclose that Propper, Beharry and ACI were actually sharing control of Acorn with Defendant Torkelsen and/or ATP.

## PROPPER AND BEHARRY CAUSE ACORN TO MAKE ILLEGAL INVESTMENTS IN COMPANIES IN WHICH THEY HAD A SUBSTANTIAL INTEREST UNDER SBA'S REGULATIONS

42.     The relevant SBA regulations were designed to prevent conflicts of interest and

- 13 -

self-dealing by SBICs. The Propper-Beharry Investments were made to Acorn, and Defendant

Torkelsen directed Acorn to make payments for the benefit of Defendants Propper and/or

Beharry in accordance with the Propper Fee Kickback and to make the investments as directed by

Propper and Beharry.

43.     Defendants Propper and/or Beharry were officers, directors, other participants in

management and/or had equity interests of at least five (5) percent of entities which received

financing from Acorn under the Investment Quid Pro Quo. Defendants Propper and Beharry had

served as officers, directors or other participants in management of those entities before financing

by Acorn. Because of the Associate relationships among Acorn, Propper, Beharry and ACI,

those financings violated SBA's conflict-of-interest regulations, 13 C.F.R. §107.730(a), (d) and

(e). In addition, irrespective of the Associate relationships among Propper, Beharry, Torkelsen,

Acorn and the small businesses that were financed by Acorn, the Investment Quid Prop Quo was

hidden from SBA in violation of 13 C.F.R. § 107.507(b) and was prejudicial to SBA, Acorn and

Acorn's other limited partners who did not share in the agreement, all in violation of 13 C.F.R.

§107.730(a). None of the Defendants sought or obtained prior written approval from SBA for an

exemption under 13 C.F.R. §107.730 compliance and were not entitled to receive those funds.

44.     Defendant Propper used his control of Acorn, hidden from the SBA, to cause or

support Acorn's investment in four companies in which Propper or Beharry served as an officer

or director more than 30 days prior to financing and/or in which Propper had at least a 5 percent

ownership interest: medibuy.com, Fresh Roast, Inc., Endo Surgical Devices, Inc., and Infant

Advantage/Parentech. All of Acorn's investments in these companies were prohibited by SBA

regulations, because Defendant Propper and Beharry's roles in the funded companies had to be

- 14 -

disclosed prior to funding and actually approved in writing by SBA under the conflict-of-interest regulations.  13 C.F.R. § 107.730.

45.     SBA's proposed approval of any conflict-of-interest transaction must be published in the Federal Register.  13 C.F.R. § 107.730(g).  SBA did not publish for approval, and did not approve, these conflict-of-interest transactions.  In addition, for the illegal investments made in Medibuy and Fresh Roast prior to licensing, SBA's pre-license investment worksheets specifically required written disclosures about potential Associate and conflict of interest relationships involving Acorn and those investments, but those relationships were not disclosed on the required worksheets by Torkelsen, Propper and/or Beharry.

46.     Acorn's investments before and after licensing in the conflict-of-interest transactions for Medibuy, Fresh Roast, Infant Advantage/Parentech and Endo Surgical Devices were in excess of $8 million.

## OVERPAYMENT OF MANAGEMENT FEES TO PROPPER AND BEHARRY

47.     A second quid pro quo agreement, the Propper Fee Kickback, provided that Defendant Torkelsen split the management fees and profits from Acorn with Defendants Propper and Beharry.  Under the SBIC regulations, the amount that could be charged in management fees was limited.  In order to support his own lavish lifestyle and to pay Defendants Propper and Beharry their share of the management fees to their companies, R.P. Associates and PB Partners, Defendant Torkelsen overpaid the management fees.

48.     Torkelsen set up a company called Princeton Technology Management, LLC (PTM), to assist them in overpaying management fees to Torkelsen, Propper and Beharry.  PTM was nominally owned by Torkelsen's wife and his son.

- 15 -

49.     Under the Act and SBIC regulations, the amount of money that a SBIC can be charged for management fees is limited. 15 U.S.C. § 683(g)(7); 13 C.F.R. §107.520.

50.     As identified above, under the Propper Fee Kickback, Propper received a portion of Acorn's management fees indirectly through ATP and/or PTM totaling at least $420,000. In addition, Propper and Beharry received directly or indirectly payments of at least $625,000 from Acorn in 2000 and 2001 that were reported to SBA as consulting expenses, but which were actually paid as part of the Propper Fee Kickback. These transactions violated 13 C.F.R. §§ 107.507(b), 510, 520 and 730. Defendants Propper, Beharry and Torkelsen created, conspired to create or caused to be created false records and statements to be submitted to SBA, or otherwise used by Torkelsen for submission, for false claims to SBA regarding those payments, the Propper Fee Kickback and false statements of compliance with SBA's regulations.

51.     By participating in a scheme to violate the SBA rules, Defendants Torkelsen, Propper, and Beharry submitted or caused to be submitted false statements and/or false claims to the government to obtain SBA's approval concerning management fees. Defendants Propper and Beharry also submitted documents to SBA that concealed the illegal control that Propper possessed with respect to Acorn. Defendants Propper and Beharry also created or caused to be created false records or statements for use by Torkelsen to conceal their illegal agreement with Torkelsen from SBA and maintain the flow of funds from SBA to Acorn.

## TORKELSEN'S ILLEGAL CONFLICT-OF-INTEREST TRANSACTIONS

52.     SemiSystems, Inc. and VeriVoice, Inc. are two companies with which Torkelsen had prior relationships since about 1995. At no time did Acorn submit a pre-license request for SBA's permission to invest in SemiSystems, Inc. or VeriVoice, Inc. nor did it ever submit a Pre-

license Investment Worksheet for either of them.

53.     Acorn did, however, make multiple pre-license investments in SemiSystems.
Starting in March 1998, less than three months before Defendant Torkelsen signed Acorn's SBIC
application, and continuing through May 1999, less than six weeks after Torkelsen had sought
SBA's advance permission on three separate occasions to make pre-license investments in other
companies, Acorn made twelve pre-license investments in SemiSystems. Acorn also made
multiple investments in VeriVoice in March, April and May of 1999.

54.     In fact, Acorn had a conflict-of-interest in its investments in SemiSystems and
VeriVoice due to the fact that, according to the license application, Defendant Torkelsen owned
more than 30% of SemiSystems and VeriVoice.

55.     After being licensed on June 25, 1999, and despite the continuing conflict-of-
interest posed by Defendant Torkelsen's substantial ownership interest in the company, Acorn
continued to finance SemiSystems and VeriVoice. Between March 25, 1998, and December 13,
2001, Defendant Torkelsen caused Acorn to provide more than $2,600,000 in funds to
SemiSystems, as well as over $4,400,000 to VeriVoice, in violation of 13 C.F.R. § 107.730.

56.     At all times since the formation of Acorn, Defendant Torkelsen directly or
indirectly controlled the affairs and operations of SemiSystems and VeriVoice, as well as Acorn.
He used this dual control to carry out precisely the kind of self-dealing that the conflict-of-
interest regulations were designed to prevent. Specifically, Defendant Torkelsen and the other
defendants used SemiSystems as a conduit to channel funds from Acorn back to the Torkelsen
family.

57.     During the same time period that Acorn was supplying SemiSystems with $ 2.6

- 17 -

million in SBIC funds, SemiSystems disbursed over $1.1 million to or for the benefit of
Defendant Torkelsen, his family, or their companies.

58.     To carry out this diversion of funds, Christine Sweeney, an employee of
Defendant Torkelsen, acting as SemiSystems' Secretary, opened two bank accounts for
SemiSystems at the same bank used by Acorn. Both bank accounts listed Defendant Torkelsen's
son as the sole authorized signatory. At least $ 1.5 million of SBIC funds passed through these
accounts in the name of SemiSystems for which Defendant Torkelsen's son was the sole
signatory. In effect, the Torkelsens were looting the companies they controlled of SBA's money.

59.     Among SemiSystems' disbursements were more than $13,000, paid directly to
defendant Pamela Torkelsen and $ 790,000 to PTM, a company owned 80% by Pamela
Torkelsen, Defendant Torkelsen's wife.

60.     The purported basis for SemiSystems' payments to PTM were billings for a
$5,000 "monthly administration fee" as well as billings for work purportedly performed on
SemiSystems' behalf by, inter alia, Defendant Torkelsen and his son.

61.     Despite the fact that PTM's billings to SemiSystems amounted to only
$118,687.92, Defendant Torkelsen directed SemiSystems to make payments of more than
$790,000 to PTM at Defendant Torkelsen's direction.

62.     Even the $118,687.92 actually billed by PTM was fraudulently inflated.

63.     In addition to the payments to Pamela Torkelsen and PTM, SemiSystems also
made payments of more than $200,000 to Silicon Valley Bank on account of a loan personally
guaranteed by Defendant Torkelsen.

64.     All of these inflated payments were inappropriate, and violated SBA regulations.

13 C.F.R. §§ 107.500, 730(a) and 900. Because of these payments, and because of the conflicts of interest and other false submissions, the certifications Defendant Torkelsen was required to submit to SBA in order to make draws were false.

**FALSE STATEMENTS AS TO THE TYRE LYNX-SEMISYSTEMS TRANSACTION**

65.     Defendant Torkelsen had directed Acorn to invest in a portfolio company called SemiSystems, Inc. (SemiSystems). Defendant Torkelsen had an illegal conflict-of-interest involving SemiSystems, because he had been a director of SemiSystems since as least 1995 and had owned more than 30 percent of the company.

66.     Defendant Torkelsen caused Acorn to provide more than $2,600,000 of federal funds to SemiSystems, Inc. between March 25, 1998, and December 13, 2001.

67.     SemiSystems was in the business of making equipment for tractor trailers. At the end of 1999, SemiSystems began experiencing financial difficulties. The company required more money to continue operating, but SBA regulations forbade Acorn from investing the amount of money in SemiSystems that Torkelsen intended to invest to keep SemiSystems afloat.

68.     Specifically, SBA regulations forbid SBICs from investing a disproportionately large amount of funds in any one portfolio company, thus insuring proper diversification and reducing overall risk to the government and other SBIC investors. Any investment over the limit set by the regulation was prohibited, and could result in the suspension of an SBIC's license. These prohibited investments are known as "overline" transactions, 13 C.F.R. §107.740.

69.     SemiSystems had been preparing to merge into a separate company called "Tyre Lynx." When it became apparent that planned investments by Acorn in the merged SemiSystems/Tyre Lynx company would lead to an overline violation under 13 C.F.R. §107.740,

- 19 -

Defendant Torkelsen devised a plan to hide the true recipient of additional funding from SBA.

70.     Specifically, the plan involved terminating the planned merger between SemiSystems and Tyre Lynx, and setting up a licensing agreement whereby Tyre Lynx would become a licensee of SemiSystems' technology. By configuring the companies in this manner, Defendant Torkelsen planned to have Acorn invest in Tyre Lynx and SemiSystems in violation of SBA's overline limitations under 13 C.F.R. §107.740, and to facilitate his continued violations of 13 C.F.R. §107.730.

71.     The initial sole officer, director, and sole shareholder, of Tyre Lynx, was Pamela Torkelsen, wife of Defendant Torkelsen. She was installed on October 29, 1999. Pamela Torkelsen's relationship with Defendant Torkelsen made Tyre Lynx an Associate of Acorn under 13 C.F.R. §107.50. Any investment by Acorn in Tyre Lynx would have been prohibited as self-dealing under 13 C.F.R. §107.730.

72.     SBA examiners became concerned about an apparent conflict-of-interest posed by Pamela Torkelsen's role in Tyre Lynx, and suspended Acorn's ability to get federal funds from SBA. To put the SBA at ease and have Acorn's ability to make leverage draws from SBA reinstated, Defendant Torkelsen caused his lawyers to send a letter to SBA examiner Mark Mead on March 2, 2001 stating that Pamela Torkelsen had divested herself of all interest in Tyre Lynx on June 15, 2000. This representation was false.

73.     As reported to SBA, on June 15, 2000, Tyre Lynx was purportedly restructured. Pamela Torkelsen was purportedly replaced as sole owner by R. Wood Tate, and was replaced as the sole director by a board consisting of Tate and Defendant Torkelsen. At the same time, purportedly, Tate was elected President, Defendant Torkelsen's son was elected Treasurer, and

- 20 -

Christine Sweeney, an Acorn employee, was elected Secretary of Tyre Lynx. This re-structuring did not, in fact, occur until at least 2001, as known by Defendant Torkelsen.

74.     Thereafter, Acorn continued to provide funding to Tyre Lynx. From July 17, 2000 to December 13, 2001 Acorn invested an additional $2.2 million in thirty separate funding events.

75.     From December 2000 to December 2001, PTM (the firm owned 80% by Pamela Torkelsen) submitted invoices to Tyre Lynx totaling $253,789.96. These billings were fraudulently inflated. Nonetheless, during this same 13-month period, Defendant Torkelsen's son directed Tyre Lynx's bank to transfer in excess of $388,000 from Tyre Lynx to PTM. Thus, Defendant Torkelsen's son had Tyre Lynx pay his stepmother's firm nearly $135,000 more than that firm had even billed.

76.     In addition to these payments to PTM between June 2000 and December 2001 Tate and/or Defendant Torkelsen's son directed additional disbursements amounting to $375,000 from Tyre Lynx's account to Silicon Valley Bank on account of a debt in the name of SemiSystems that had been personally guaranteed by Defendant Torkelsen.

77.     In October/November 2000, SBA conducted a periodic examination of Acorn. In the course of the examination, the SBA discovered (i) Pamela Torkelsen's role in the founding of Tyre Lynx as well as (ii) her purported replacement by Acorn insider Tate.

78.     The Tyre Lynx conflicts of interest were discussed with Torkelsen during an exit interview with the SBA examiner. Torkelsen admitted to the examiner's findings, promised to provide an explanation by letter, and added that he had resigned his own Tyre Lynx Board position as of the date of the exit interview.

79.     On January 19, 2001, the SBA formally notified Torkelsen of the adverse findings

of its examination, including the self-dealing investments in Tyre Lynx.  The SBA advised that,

in view of the seriousness of the violations, Acorn would be allowed no further draws of

government funds until the findings were resolved.

80.     Defendant Torkelsen sent a letter to SBA dated January 9, 2001 that stated that

Alfred Wiest was the founder and majority stockholder of Tyre Lynx.

81.     In addition, by letter dated February 9, 2001, Defendant Torkelsen, through his

son, further responded to the SBA's conflict findings by explaining that Pamela Torkelsen's

ownership of Tyre Lynx was a matter of mere convenience so that the company's name could be

reserved and that Pamela Torkelsen's and Tate's ownership was transitory.  SBA was told that the

true founders of Tyre Lynx were Alfred Wiest and Corky Osborne and that they would own the

majority of the stock.

82.     Torkelsen caused a submission to be filed with the SBA in which it was

represented that Wiest was an officer, director and/or owner of Tyre Lynx and that Osborne was

also an owner.  Wiest and Osborne's purported principal ownership of, and roles in, Tyre Lynx

was either illusory or an outright fabrication by Torkelsen.  Up until January 22, 2001, Pamela

Torkelsen owned all of the stock of Tyre Lynx and Defendant Torkelsen controlled it.  Tate

became an owner of Tyre Lynx stock on January 22, 2001.  Wiest and Osborne never became

owners of Tyre Lynx stock because they never signed stock purchase agreements and never paid

for the shares purportedly issued to them.

83.     Based upon false statements by Torkelsen, on March 16, 2001 the SBA believed

that the conflict issue had been resolved and permitted Acorn to resume drawing on government

funds. In total, Acorn drew $32 million in government funds. Five million dollars of these funds were withdrawn after SBA resumed funding authority for Acorn March 16, 2001.

### ACORN'S FALSE CLAIMS FOR SBA FUNDING

84.     After being licensed by SBA, Acorn obtained its government funding through a series of steps. First, it submitted an application for a leverage commitment, so that SBA would commit to reserving to Acorn a portion of the funds potentially available to all SBICs under a ceiling set by Congress. After approval of the commitment, Acorn would submit a draw application in the form of a letter, with exhibits attached, to SBA's headquarters in Washington, D.C. Included as part of each of these draw applications was an "Affirmation of Compliance," signed by Torkelsen, certifying that Acorn was in full compliance with SBA's regulations. SBA reviewed and approved each of Torkelsen's draw applications.

85.     Defendant Torkelsen submitted eleven Statements of Compliance to the SBA, each certifying that Acorn was in compliance with SBA regulations. Each of the statements of compliance was false in that Torkelsen knew that Acorn was in violation of SBA's conflict-of-interest regulations and other regulations governing the management and operation of Acorn. Each of these Statements of Compliance resulted in the issuance by SBA of an "Interim Funding Approval Notice and Confirmation."

86.     As the final step in obtaining government funds, Torkelsen executed an affirmation of compliance that he transmitted to Chase Manhattan Bank, along with the SBA's "Interim Funding Approval Notice and Confirmation," to obtain the government funds. Each of these confirmations to Chase Manhattan was signed by Torkelsen, and in each Torkelsen

- 23 -

"affirmed" that Acorn was in compliance with all applicable SBA regulations.

87.    Each Affirmation of Compliance that Torkelsen transmitted to Chase Manhattan
Bank was false in that Torkelsen knew that Acorn was in violation of SBA's regulations
governing conflicts of interest, management and operations of Acorn.  Each Affirmation of
Compliance resulted in the Chase Manhattan Bank wiring government funds to Acorn.
Defendants Propper and Beharry knew that Torkelsen and Acorn was applying for SBA funds
and certifying compliance with the SBIC program.  Defendants Propper and Beharry knew, by
virtue of their participation in the transactions that violated SBA's regulations, Torkelsen's and
Acorn's certifications were false and by their participation in these transactions caused these
false claims and false statements to be made to the SBA.

88.    In all, Acorn obtained $32 million in government funds through its false
Certifications of Compliance to SBA and its false Affirmations of Compliance to Chase
Manhattan.

| Application and Certification | Approved and Disbursed | Amount |
| --- | --- | --- |
| September 13, 1999 | September 24, 1999 | $7,000,000 |
| November 12, 1999 | November 29, 1999 | $5,000,000 |
| January 18, 2000 | January 28, 2000 | $8,000,000 |
| March 14, 2000 | March 23, 2000 | $2,000,000 |
| June 20, 2000 | June 29, 2000 | $3,200,000 |
| November 10, 2000 | November 24, 2000 | $1,800,000 |

| June 29, 2001 | July 25, 2001 | $1,500,000 |
| August 31, 2001 | September 19, 2001 | $750,000 |
| October 1, 2001 | October 10, 2001 | $575,000 |
| November 15, 2001 | November 26, 2001 | $1,575,000 |
| December 3, 2001 | December 14, 2001 | $600,000 |

## ADDITIONAL FALSE CLAIMS SUBMITTED BY DEFENDANT TORKELSEN, PROPPER, AND BEHARRY

89.     Between December of 2000 and December of 2001, PVC invoiced Tyre Lynx for over $250,000.  Defendant Torkelsen's son directed Tyre Lynx to transfer of $388,000 to PVC.

90.     Between December of 2000 and January of 2001, R.P. Associates and/or PB Partners demanded payment from Defendant Torkelsen and Acorn for $625,000 in "consulting fees."  These fees were actually paid as part of the Propper Fee Kickback.  These transactions violated 13 C.F.R. §§ 107.507(b), 510, 520, and 730.

91.     In January of 2001, Defendant Torkelsen filed a disclosure statement with the SBA that failed to disclose his son and Christine Sweeney's positions as officers of Tyre Lynx.

92.     In addition to the conflict-of-interest transactions, the false statements of account balances, the false assurances and Certificate of Compliance to the SBA, and the illegal incorporation of Acorn, Defendant Torkelsen also violated the program rules by extracting exorbitant and premature management fees from Acorn.

93.     Specifically, Defendant Torkelsen and his family devised a scheme to "pre-pay"

management fees from Acorn to concerns that they controlled, and over the life of Acorn, diverted millions of dollars in management fees to themselves

94.     At Torkelsen's direction, Acorn made numerous unsecured, interest-free cash advances to its general partner, ATP. At one point these cash advances totaled as high as $3.3 million.   None of these advances were properly disclosed to SBA.

95.     At Defendant Torkelsen's direction, Acorn paid its general partner - which he owned and controlled - fees far in excess of those allowed by law.

96.     At Defendants' direction, Acorn paid fees to its general partner in advance of when they were earned.

97.     None of the above conduct was appropriately and timely disclosed to SBA. Had SBA known the full scope of Defendant Torkelsen's acts, and the acts of concealment by the other Defendants, it would have discontinued payments to Acorn.

**SOVEREIGN BANK'S FALSE STATEMENT TO THE SBA**

98.     Between April and July of 2000, Defendant Torkelsen met with officers of Main Street Bank (a predecessor-in-interest to Defendant Sovereign Bank) and arranged for a $2 million loan from Main Street Bank to PTM, the proceeds of which were deposited in a certificate of deposit. The loan to PTM was secured by Acorn's assets. The purpose of this transaction was to artificially inflate Acorn's balance sheet, to enable it to receive more leverage money from SBA, and to cover up for Torkelsen's embezzlement and mismanagement.

99.     PTM was owned by Defendant Torkelsen's wife and son. PVC was owned 80% by Torkelsen's wife, 10% by his son and 10% by his other children through the Torkelsen Ladies, LLC. PVC and PTM were each Associates under SBA's regulations and the pledge of Acorn's

assets to secure the loans were illegal financings under 13 C.F.R. § 107.730(a) and also a
violation of 13 C.F.R. § 107.550.

100.    In October of 2000, Sovereign Bank received a request from SBA to confirm
Acorn's account balances, and to detail any encumbrances on the accounts. A Sovereign Bank
loan officer completed and returned a standard form that contained the account balances, but did
not disclose that all of the money in a $2 million certificate of deposit was encumbered. On the
back of the form were written the values for a number of deposits into an Acorn account, and
Sovereign Bank confirmed that the account was "unencumbered and the bank has no right,
written or otherwise, to restrict use of or the withdrawal of funds from this account."

101.    Sovereign Bank knew that the form would be submitted to the government.
Sovereign Bank also knew from the form that SBA specifically wanted verification of whether
there were any encumbrances on the identified accounts, including the $2 million certificate of
deposit.

102.    Sovereign Bank recognized that the information it supplied on the front of the
form was misleading in that it did not disclose the encumbrance of the funds, and altered the
form by typing "deposit verification only" at the top of it in order to further mislead SBA as to
the status of the deposits identified, including the certificate of deposit. Sovereign Bank's
verification was false and misleading because, as signed and submitted by Sovereign Bank, it
failed to disclose the encumbrance on the $2 million certificate of deposit.

103.    Defendant Torkelsen then submitted the form to SBA, which relied on it and
ultimately released an additional five million dollars to Acorn.

104.    Based in part on the representations of Sovereign Bank, the SBA did not discover

- 27 -

that Acorn actually had much less money than it said it did. Based on the representations of the Banks, the SBA approved an additional \$5 million of disbursements to Acorn.

## COUNT 1

### VIOLATIONS OF THE FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1) AGAINST ALL DEFENDANTS

105.    Plaintiff re-alleges and incorporates herein by reference paragraphs 1 through 104.

106.    All Defendants identified more specifically below, knowingly presented or caused to be presented false or fraudulent claims to the SBA for payment under the SBIC program, in violation of the FCA, 31 U.S.C. § 3729 (a)(1).

107.    By virtue of these false or fraudulent claims, the United States suffered damages in an amount to be determined at trial.

## COUNT 2

### VIOLATIONS OF THE FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(2) AGAINST ALL DEFENDANTS

108.    Plaintiff re-alleges and incorporates herein by reference paragraphs 1 through 104.

109.    All Defendants identified more specifically below, knowingly made or caused to be made false statements to get a false or fraudulent claim paid by the United States for payment by the SBIC program, in violation of the FCA, 31 U.S.C. § 3729 (a)(2).

110.    By virtue of these false statements, the United States suffered damages in an amount to be determined at trial.

## COUNT 3

### VIOLATIONS OF THE FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(3) AGAINST DEFENDANTS TORKELSEN, PROPPER AND BEHARRY

- 28 -

111.    Plaintiff re-alleges and incorporates herein by reference paragraphs 1 through 104.

112.    All Defendants identified more specifically below, conspired to defraud the United States by getting false or fraudulent claims paid by the SBIC program, in violation of the FCA, 31 U.S.C. § 3729 (a)(3).

A.    **The Conspiracy to Hide Propper and Beharry's Involvement in Acorn's Investment Decisions and the *Quid Pro Quo* Agreements**

113.    As described more specifically above, Acorn's certifications in connection with its draw applications from 1999 to 2001 were false or fraudulent because Acorn did not disclose to SBA the role that Propper and Beharry were playing in selecting investments that were being made by Acorn and that Torkelsen was splitting the management fees and profits with them. Defendants Torkelsen, Propper, and Beharry knew of the investment and management control being exercised by Propper and Beharry over Acorn and the payments of management fees to Propper and Beharry and conspired to get Acorn's false or fraudulent draw applications paid.

114.    The Defendants identified in the preceding paragraph entered into agreements to have the United States pay false or fraudulent claims by entering into a conspiracy to hide Propper and Beharry's involvement in the control and management of Acorn and to further hide the split of the management fees from Acorn between Torkelsen and Propper and Beharry.  The specific acts of these Defendants in furtherance of this conspiracy are set forth above .

B.    **The Conspiracy Concerning the Tyre Lynx Transactions**

115.    As described more specifically above, Acorn's certifications in connection with its draw applications from 1999 to 2001 were false or fraudulent because Acorn did not disclose to the SBA that Torkelsen and his wife owned and controlled Tyre Lynx and that Acorn was

- 29 -

making overline investments in Tyre Lynx and its affiliated corporation, Semi Systems.

Defendant Torkelsen conspired to get Acorn's false or fraudulent draw applications paid.

116.    The Defendants identified in the preceding paragraph entered into agreements to
cause the United States to pay false or fraudulent claims by entering into a conspiracy to hide the
fact that the Torkelsens owned and controlled Tyre Lynx and to further mislead the SBA into
thinking that any conflict-of-interest related to Acorn's investment in Tyre Lynx has been
resolved.  The specific acts of these Defendants in furtherance of this conspiracy are set forth
above.

## C.    The Conspiracy Concerning the Torkelsen, Propper and Beharry Conflict-of-interest Transactions

117.    As described more specifically above, Acorn's certifications in connection with its
draw applications from 1999 to 2001 were false or fraudulent because Acorn did not disclose to
the SBA that Acorn was making investments into portfolio companies, including medibuy.com,
Fresh Roast, Endo Surgical Devices, and Infant Advantage/Parentech, that constituted conflict of
interest financings because of the roles of Propper and Beharry as officers, directors and/or
greater than 5% owners in the companies and their status as Associates of Acorn.  Defendants
Torkelsen, Propper, and Beharry were aware of the nature of the relationships among Propper
and Beharry and those companies and conspired to get Acorn's false or fraudulent draw
applications paid.

118.    The Defendants identified in the preceding paragraph entered into agreements to
have the United States pay false or fraudulent claims by entering into a conspiracy to hide the
conflict of interest nature of the investments in medibuy.com, Fresh Roast, Endo Surgical

Devices, and Infant Advantage/Parentech . The specific acts of these Defendants in furtherance of this conspiracy are set forth above.

119.    By virtue of these conspiracies, the United States suffered damages in an amount to be determined at trial.

## COUNT 4

### PAYMENT BY MISTAKE
### AGAINST DEFENDANTS TORKELSEN, PROPPER AND BEHARRY

120.    The United States incorporates by reference the allegations contained in paragraphs 1 through 104.

121.    The SBA made payments to Acorn, which were funneled to Torkelsen, Propper and Beharry in the erroneous belief that Acorn was entitled to these funds, without knowing that Acorn's claims were made as part of a scheme to defraud the SBA, arose out of improper financial relationships, and/or were otherwise unjustified.

122.    The United States' erroneous beliefs were material to the amount of the payments made by the United States.

123.    Because of these mistakes of fact, these Defendants received funds to which they were not entitled.

124.    By reason of the overpayments, the United States is entitled to damages in an amount to be established at trial.

## COUNT 5

### UNJUST ENRICHMENT
### AGAINST DEFENDANTS TORKELSEN, PROPPER AND BEHARRY

125.    The United States incorporates by reference the allegations contained in

- 31 -

paragraphs 1 through 104.

126.   The SBA made payments to Acorn, which were funneled to Torkelsen, Propper and Beharry in the erroneous belief that Acorn was entitled to these funds, without knowing that Acorn's claims were made as part of a scheme to defraud the SBA, arose out of improper financial relationships, and/or were otherwise unjustified.

127.   The United States is entitled to the return of all overpayments paid by the SBA to Acorn due to the false claims submitted for $32,000,000.00.

128.   By reason of the above-described payments, Defendants Torkelsen, Propper and Beharry, have received money, directly or indirectly, to which they were not entitled.  They therefore have been unjustly enriched in an amount to be established at trial.

**PRAYER FOR RELIEF**

**AS TO COUNT 1:**

As against all Defendants, judgment in an amount equal to:

1.   statutory damages in an amount to be established at trial;

2.   civil penalties for each false claim or false statement as provided by law;

3.   the cost of this action, plus interest, as provided by law;

4.   an accounting;

5.   any other relief that this Court deems appropriate.

**AS TO COUNT 2:**

As against all Defendants, judgment in an amount equal to:

1.   statutory damages in an amount to be established at trial;

2.   civil penalties for each false claim or false statement as provided by law;

- 32 -

3.      the cost of this action, plus interest, as provided by law;

4.      an accounting;

5.      any other relief that this Court deems appropriate.

**AS TO COUNT 3:**

As against Defendants Torkelsen, Propper, and Beharry, judgment in an amount equal to:

1.      statutory damages in an amount to be established at trial;

2.      civil penalties for each false claim or false statement as provided by law;

3.      the cost of this action, plus interest, as provided by law;

4.      an accounting;

5.      any other relief that this Court deems appropriate.

**AS TO COUNT 4:**

As against Defendants Torkelsen, Propper and Beharry, judgment in an amount equal to:

1.      the money paid by the United States, through Acorn, to these Defendants, plus interest;

2.      the cost of this action, plus interest, as provided by law;

3.      an accounting;

4.      any other relief that this Court deems appropriate.

**AS TO COUNT 5:**

As against Defendants Torkelsen, Propper and Beharry, judgment in  an amount equal to:

1.      the money paid by the United States, through Acorn, to these Defendants plus interest;

2.      the cost of this action, plus interest, as provided by law;

3.      an accounting;

4.      any other relief that this Court deems appropriate.

DATED:      December 29, 2006

                                Respectfully submitted,

                                PETER D. KEISLER
                                Assistant Attorney General

                                Jordan L Strauss /ses for

                                MICHAEL F. HERTZ
                                PATRICIA R. DAVIS
                                ALICIA J. BENTLEY
                                JORDAN L. STRAUSS
                                SUSAN BECKER
                                Attorneys, Department of Justice
                                Civil Division
                                Post Office Box 261
                                Ben Franklin Station
                                Washington, DC  20044
                                Tel:  (202) 353-2682
                                Fax:  (202) 514-0280

- 34 -